Filed 9/16/21

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>JOHN JOSEPH MONTOYA,<br><br>     Defendant and Appellant. | F079501<br><br>(Super. Ct. No. VCF347558)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Kathryn T. Montejano, Judge.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Michael Dolida, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.b.ii., II., and III. of the Discussion.

# INTRODUCTION

Defendant John Joseph Montoya, formerly a physical therapist, was charged with sexual penetration by foreign object (Pen. Code,[1] § 289, subd. (a)(1)(A) [count 1]), sexual penetration by foreign object of a person incapable of giving legal consent because of a mental disorder or developmental or physical disability (§ 289, subd. (b) [count 2]), sexual battery (§ 243.4, subd. (a) [count 3]), lewd conduct by a caretaker upon a dependent person by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person (§ 288, subd. (b)(2) [count 4]), and lewd conduct by a caretaker upon a dependent person (§ 288, subd. (c)(2) [count 5]). Pursuant to a plea agreement, he pled nolo contendere to count 5 and the remaining charges were dismissed. Defendant received a one-year jail sentence, of which 364 days were suspended, one day of credit for time spent in custody awaiting sentencing, and three years' felony probation. He was also ordered to pay a $40 court operations assessment (§ 1465.8, subd. (a)(1)) and a $30 court facilities assessment (Gov. Code, § 70373).

Defendant appealed. After the parties filed their initial briefs, we ordered them to file supplemental briefs addressing the applicability of Assembly Bill No. 1950 (2019-2020 Reg. Sess.) (Assembly Bill No. 1950) (Stats. 2020, ch. 328, § 2). Effective January 1, 2021, Assembly Bill No. 1950 amended section 1203.1 to limit the maximum probation term a trial court is authorized to impose for most felony offenses to two years.

In his opening brief, defendant makes two contentions. First, the trial court "abused its discretion by denying [his] motion to withdraw his plea." (Boldface & capitalization omitted.) Second, in view of *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), the court must vacate or stay the $40 court operations assessment and the

---

[1]     Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

$30 court facilities assessment "because there was no finding of [his] present ability to pay." (Boldface & capitalization omitted.)

In his supplemental brief, defendant argues that Assembly Bill No. 1950 applies retroactively to his case and the matter should be remanded to the trial court "for the purpose of modifying [his] term of probation to two years." In its supplemental brief, the Attorney General agrees that defendant "is entitled to the retroactive benefit of A.B. No. 1950" and asks us to "remand the matter for the limited purpose of allowing the superior court to conform [his] sentence to the requirements described in A.B. No. 1950" and "to allow the prosecution an opportunity to accept the modification or to withdraw from the plea agreement." We accept this concession.

We also conclude: (1) the trial court did not abuse its discretion when it denied defendant's withdrawal motion; and (2) because the case will be remanded for modification of the length of defendant's probation term, defendant's *Dueñas* argument is moot.

## STATEMENT OF FACTS[2]

Defendant, who had been a licensed physical therapist since 1995, worked for two home health agencies: Agency A and Agency B. Beginning in September 2015, through Agency A, he provided in-home physical therapy twice a week to T.M., an adult female who suffers from multiple sclerosis and is paraplegic. He continued to treat her when she switched from Agency A to Agency B in October or November 2015. T.M. remained defendant's designated patient until January 8, 2016, when she enrolled in an outpatient

---

[2]     The facts are taken from the transcript of the preliminary hearing held on April 3 and 4, 2018, and documentation filed in connection with the Physical Therapy Board of California's recommendation to restrict defendant's practice during the pendency of the criminal action as a condition of bail or own recognizance release (see § 23).

Pursuant to California Rules of Court, rule 8.90, we refer to certain individuals by their initials to protect personal privacy interests. No disrespect is intended. Similarly, we refer to certain entities by pseudonyms.

3.

physical therapy program.  Nonetheless, defendant and T.M. "stayed in contact through text messages or telephone calls" and he "[went] to her house on occasions during his own time to give her additional physical therapy."

Sometime in March 2016, T.M. was at home with her mother F.M. when defendant dropped by unannounced.  He was wearing "medical scrubs" and a work badge.  Defendant entered T.M.'s bedroom—where T.M. was lying on her bed—and closed the door.  At some point, he put his hand under her sweatpants and diaper and inserted his finger into her vagina for approximately three minutes.  After defendant left the residence, F.M. went to T.M.'s bedroom and noticed that T.M.'s diaper was "a little bit crooked."  She also observed that the curtains, which she normally "tie[d] . . . with a string" during daylight hours, were "closed."  When F.M. asked if "something was wrong," T.M. replied that defendant "touched her down there."

At the preliminary hearing, T.M. testified that defendant "violated" her.  She was scared at the time of the incident because he was her physical therapist.  T.M. later mentioned that she was afraid that he was "gonna beat [her] up."  She stated that she "don't [*sic*] want him to do that with any other lady."  On cross-examination, the following colloquy transpired between T.M. and defendant's then-attorney Robert Bartlett:

> "Q    Okay.  So do I understand you correctly today that when [defendant] did this, that you were okay with it, that you consented to it?
>
> "A    Yes.
>
> "Q    Okay.  So you could have told him no; is that true?
>
> "A    Yes.
>
> "Q    Okay.  But you didn't tell him no?
>
> "A    Yes.
>
> "Q    Okay.  And you didn't tell him to stop?

"A	No.

"Q	Okay. Do you feel . . . that you understood everything that was happening?

"A	Yes." (Boldface omitted.)

On redirect examination, the prosecutor asked T.M. whether she understood the meaning of consent. The following colloquy transpired:

"A	To consent is when you –

"Q	It's okay. It's okay.

"A	No. (Crying.) Tell her to tell me what consent is.

"Q	So you want me to tell you what consent means?

"A	(Nods head affirmatively.)

"Q	Okay. But I need to find out if you know what consent means. Do you know? Can you tell us?

"A	What you tell you're saying that the person – (crying) – person did to – (crying) – to hurt you.

"Q	So you think that consent means to tell –

"A	What –

"Q	-- to tell the person that you – that did to you to hurt you?

"A	And that I trusted the person and I agree with the person to do whatever they wanted to do. I have to be the one, first one to agreeing to.

"Q	So consent means you have to be the first one to agree to what the other person wants you to do?

"A	Yes.

"Q	Okay. And so in the situation with [defendant], is this what you understand by consent?

"A	No.

"Q	No?

5.

"A Because that – what I agreeing to I thought what is asking you, isn't that –

"Q Okay. Let's cut back. So you're asking me if it is okay?

"A Yes.

"Q Okay. All right. Let me ask you the question again. It's okay. No problem. Don't worry. Don't worry. [¶] You told us yesterday, and this is your own words, that [defendant] violated you.

"A (Nods head affirmatively.)

"Q Was that something that you agreed to?

"A (Nods head affirmatively.)

"Q So you're saying yes?

"A Yes.

"Q Or no?

"A Yes.

"Q So when [defendant] put his fingers inside of you –

"A Only one finger.

"Q Only one. There was – that was about that. Did you want that? Did you not want that?

"A No, I didn't want it.

"Q Okay. And did you say – tell him, 'Yes, you can do it,' or 'No, you cannot do it'?

"A No, I didn't. I should have.

"Q Okay. So were you able or were you not able to say anything to [defendant] when he put his finger inside of you?

"A Yes.

"Q Were you able or not able?

"A I was able.

6.

"Q    So you were able to say something to him?

"A    Yes.

"Q    What was it?

"A    No.

"Q    You told him no?

"A    I couldn't, but I didn't tell him no.

"Q    Why didn't – why didn't you tell him no?

"A    I was shocked.

"Q    Shocked?

"A    (Nods head affirmatively.)

"Q    Okay.

"A    He was my therapist.

"Q    He was your therapist?

"A    And that's all."  (Boldface omitted.)

Officer Kelly of the Tulare Police Department testified that he interviewed T.M. and F.M. on March 28, 2016.  Both stated that they believed defendant had been directed by Agency B to provide physical therapy to T.M.  Kelly later interrogated defendant, who admitted that he "placed one finger inside [T.M.'s] vagina and moved it in and out" but maintained that he "asked her during the massage if she wanted him to massage her down there" and "she shook her head up and down, indicating yes to him."  Kelly also spoke with Dr. Ramu Thiagarajan, T.M.'s neurologist for approximately 10 years.  She informed him that T.M. "is diagnosed with multiple sclerosis," "essential hypertension," "[pseudobulbar] effect," and "chronic insomnia"; "suffers from memory loss"; has "impaired" cognitive abilities; and "is totally dependent on others."  Because T.M.'s

multiple sclerosis "has progressed to the most advanced stage," Thiagarajan opined that she "is no longer able to make any legal decisions for herself."

**DISCUSSION**

**I.     Defendant's motion to withdraw plea**

a. *Background*

At the change-of-plea hearing on July 13, 2018, the following colloquy transpired:

"MR. BARTLETT:  Judge, at this time, Mr. Montoya will be entering a no contest plea, and I believe it's Count 5, violation of Penal Code Section 288(c)(2) as a felony.

"THE COURT:  All right.  And then my understanding is that that sentencing range is a one, two, three; that the court's intent, and this was agreed to by the parties, was to sentence Mr. Montoya to one year and suspend 364 days.

"MR. BARTLETT:  That's correct, Judge.

"THE COURT:  All right.

"[PROSECUTOR]:  That's correct, and then the People would dismiss the rest of the counts at sentencing, but he has to be – he needs to be advised – he needs to be advised now before he pleads that this would carry a lifetime registration.

"MR. BARTLETT:  Of course.

"THE COURT:  Correct.

"[PROSECUTOR]:  And I do not know if our information states that because – it doesn't, but –

"MR. BARTLETT:  It's okay.

"THE COURT:  So Mr. Montoya, do you understand that?

"THE DEFENDANT:  Yes.

"THE COURT:  Okay, very well.  All right.  So based on the offer, the maximum sentence you can receive is three years; correct, counsel?

"[PROSECUTOR]:  That is correct.

8.

"MR. BARTLETT: That's right, Judge.

"THE COURT: All right. And I just indicated to you, Mr. Montoya, what the indicated sentence is. So we discussed the maximum sentence, what the indicated sentence is. [¶] . . . [¶] . . . Do you understand that if you're placed on probation that you could serve up to one year in the county jail and be subjected to a fine of up to $10,000?

"THE DEFENDANT: Yes.

"THE COURT: Do you understand that if you are sent to state prison that the maximum parole period would be for three years and, further, if you're violated on parole, you could be sent back to state prison for each violation totaling up to four years and pay a parole revocation fine. [¶] Do you understand that?

"THE DEFENDANT: Yes.

"THE COURT: Do you understand that as a result of your plea you may be required to pay restitution, as well as a restitution fine between 300 and $10,000?

"THE DEFENDANT: Yes.

"THE COURT: Do you understand that a plea of no contest is the same as a guilty plea for purposes of sentencing?

"THE DEFENDANT: Yes.

"THE COURT: Other than what I have told you regarding the consequences of your plea, has anybody threatened you or promised you anything to get you to enter into this plea?

"THE DEFENDANT: No.

"THE COURT: Have you used any medication, alcohol or drugs that would affect your ability to understand what we're doing here today?

"THE DEFENDANT: No.

"THE COURT: Okay. Have you had enough time to discuss these matters with your attorney?

"THE DEFENDANT: Yes.

"THE COURT:  Have you given your attorney all the facts about your case?

"THE DEFENDANT:  Yes.

"THE COURT:  And are you satisfied with the services and the advice of your attorney?

"THE DEFENDANT:  Yes.

"THE COURT:  In this matter, sir, you're entitled to have a trial, you're post-prelim, by either a court or jury.  [¶]  Are you willing to give up that right?

"THE DEFENDANT:  Yes.

"THE COURT:  You also have the right to present a defense and to use the subpoena power of the court to bring witnesses to court no expense to you.  [¶]  Are you willing to give up that right?

"THE DEFENDANT:  Yes.

"THE COURT:  You also have the right to confront and cross-examine witnesses who might testify against you.  [¶]  Are you willing to give up that right?

"THE DEFENDANT:  Yes.

"THE COURT:  You also have a 5th Amendment right against self-incrimination which means no one can make you plead guilty or no contest unless you choose to do so.  [¶]  Are you willing to give up that right?

"THE DEFENDANT:  Yes.

"THE COURT:  Counsel, is there a stipulation to a factual basis?

"MR. BARTLETT:  Yes.

"[PROSECUTOR]:  Yes, based on the police reports and the lengthy preliminary hearing.

"THE COURT:  All right.  And you concur, Mr. Bartlett?

"MR. BARTLETT:  Yes.

10.

"THE COURT: Mr. Bartlett, have you had enough time to discuss these matters with your client?

"MR. BARTLETT: Yes.

"THE COURT: Have you advised him of the nature of the charges, the consequences of the plea and any potential defenses that he may have?

"MR. BARTLETT: Yes.

"THE COURT: And do you believe he fully understands these matters?

"MR. BARTLETT: Yes.

"THE COURT: Sir, do you have any questions of me before I take your plea?

"THE DEFENDANT: No.

"THE COURT: All right. [¶] All right. Sir, how do you plead that on or about March 9th of 2016 in the County of Tulare that the crime of lewd act on a dependent adult in violation of Penal Code Section 288(c)(2), a felony, was committed by you, that being a caretaker, you committed an act described in Section 288(a) upon T.M., a dependent adult. [¶] How do you plead to that, sir?

"THE DEFENDANT: No contest.

"THE COURT: All right. I'm gonna accept your no contest plea. I'm gonna find that you have knowingly and intelligently waived your Constitutional rights and willingly entered into this plea."

On September 6, 2018, defendant asked the court to relieve Bartlett and appoint the public defender as counsel. The court granted the request. On November 28, 2018, defendant filed "In Pro Per" a motion to withdraw his plea. On December 11, 2018, he asked the court "to represent himself or request another P.D." Following a *Marsden*[3] hearing, the court denied the request. On January 3, 2019, the public defender filed a

---

[3] *People v. Marsden* (1970) 2 Cal.3d 118.

11.

motion to withdraw defendant's plea. On January 23, 2019, defendant filed a *Faretta*[4] motion for self-representation, which was granted.

On February 4, 2019, defendant filed an amended motion to withdraw his plea. Among other things, he stated: (1) T.M. "recanted that she did not give consent"; (2) he "was <u>not</u> a caretaker or volunteer caretaker at the date of the alleged incident" because T.M. "was discharged under [his] care as a physical therapist on January 8, 2016, a full two months prior to the alleged incident" (boldface omitted); and (3) he "was under unreasonable duress when the deal was agreed upon." As to the last point, defendant specified:

> "At the July 12[, 2018] pretrial, an offer was made to [him] that he would receive probation, lifetime registration and a one year suspended jail time if he pleaded to Count 5, a Lewd Act on Dependent Adult [(P.C. Section 288(c)(2)]. This offer was discussed with [him] and his attorney Robert Bartlett. [He] relied upon the advice of his attorney to direct him properly. Despite the fact that the only potential evidence of [his] wrongdoing was the accuser's allegation, which was previously recanted, and despite the fact that a misdemeanor was at one time offered by the District Attorney, Mr. Bartlett advised [him] that he must accept the presented plea deal with the District Attorney or else be possibly attacked, sodomized, murdered and/or objectified wearing a '288' jacket while in prison. . . . [¶] . . . [¶]

> "On the morning on July 13, [2018,] [he] wanted to continue to negotiate for a more fair deal. Mr. Bartlett stated that the District Attorney was willing to negotiate further that morning but just as he was speaking with her, she received a text message from her supervisor stating to stop all deals and take the case to trial. Mr. Bartlett told [him] that he saw the text message. Whether Mr. Bartlett lied about the text message or not, this was also a factor in coercing [him] to make a quick decision as to whether to accept the deal or not. Mr. Bartlett told [him] that he needed to take his felony deal within minutes or else the District Attorney was going to prosecute and [he] would end up in prison. . . .

> "[He] was told if he went to prison, he would be forced to wear a '288' jacket and other inmates would, thus, assume he was a convicted

---

[4] *Faretta v. California* (1975) 422 U.S. 806.

child molester.  [His] counsel told [him] he would likely be sexually assaulted and beaten severely in prison.  Earlier, before the preliminary hearing, Mr. Bartlett told [him] he would be in 'protective custody' if he went to prison.  [He] should not have been forced to accept a deal in which time pressure is used in order to scare an innocent man into pleading guilty to a crime that everyone involved in this case, INCLUDING THE ACCUSER, knows or should now know he did not commit.  It is quite frankly absurd.

"[He] was thus forced to decide in a matter of minutes between potentially being sodomized and/or murdered or accept an unjust plea deal, thereby putting faith in the system which has so far failed him.  At this point, choosing between staying with his wife and children or being attacked and/or murdered in prison and trusting the system, given an incompetent attorney's advice, [he] chose to sign the deal under extreme duress."  (Boldface omitted.)

On February 6, 2019, the prosecution filed its opposition to defendant's motion.  It countered:

"No information was misrepresented to the defendant.  No information was withheld from the defendant.  No one forced him to enter the plea.  No one tricked him into entering the plea.  The defendant did not enter the plea by mistake.  The defendant did not enter the plea inadvertently.  The defendant had enough time to speak with his lawyer and was advised of any potential defenses that he might have.  He was represented by counsel at the time he entered his plea.  The defendant, with his counsel present, prior to his plea, was fully advised by the Court of the consequences of such plea.  [¶] . . . [¶]

". . .  The People made the offer of a plea to Count 5 on July 12, 2018 but because the defendant requested additional time to speak with his attorney and consider the offer, the court allowed him to come back the next day on July 13, 2018 and inform the court and the People of his decision. . . .

"On July 13, 2018, Mr. Bartlett did ask the People for another offer of a felony violation of Penal Code Section 243.4 due to the possibility of potentially not needing to register as a sex offender for life if the law changed in the future.  The People rejected the counteroffer.  The defendant was given the option to either plea as previously offered the day before or go to trial, which were the only two options at that time. . . .

13.

"The fact that the People rejected the defendant's counteroffer and renewed the previously made offer does not in any way indicate that the defendant was pressured to accept the offer. The trial date was set well in advance on April 19, 2018. The date of July 13, 2018 was the last day when the defendant could accept the People's offer as the trial was set on July 16, 2018, and the jury panel was going to be called and appear on that day. The People were in fact ready to go to trial as the trial was confirmed on June 28, 2018.

"By providing the defendant an extra day to consider the offer and speak with his attorney, and then rejecting his counteroffer, the People did not pressure the defendant into making any decision – the People did not change the terms of the offer, and the People did not change the offer to ask for more punishment. The fact that the People refused further negotiations does not mean that any duress was exercised upon the defendant – he still could have chosen to go to trial instead of entering a plea and then face a harsher punishment. Instead, he chose to enter a plea to a plea-bargained deal, where he received a very favorable resolution with no jail time attached as opposed the prison time that he was facing if convicted.

"While it is true that the People had previously made a misdemeanor offer in the past, the misdemeanor offer made was before the preliminary hearing and the addition of Counts 4 and 5 to the complaint, and that offer was then revoked after the preliminary hearing and the addition of those counts. The offer that the defendant was presented with at his jury trial confirmation date was a felony plea offer; the misdemeanor offer was no longer available as it was previously revoked."

A hearing on defendant's withdrawal motion was held on February 27, 2019. Defendant reiterated the points of his motion. Regarding the text message, the prosecutor explained:

"In December of 2018, the law as it stood required the defendant to enter – to have a lifetime registration for the charges he was going to plead to. Mr. Bartlett wanted the defendant to plead to a charge which was a felony that might in the future not require a lifetime registration. This is when I spoke with my supervisor and asked her if – if that – if we should do that, and she said no. I agreed with her, and this is when we said no, our offer stands as it is for the defendant to plead to Count 5 and have the lifetime registration and receive no time in custody.

14.

"This text that has been brought up so many times, there is nothing inappropriate in me communicating with my supervisor to get a clarification as to a plea.

"The offer did not change on that day. I did not add any additional terms. I did not pressure the defendant. He had the choice to either plead as the offer stood, which is the power of the prosecution to decide what offer to make, or go to trial when we were ready to go to trial."

After listening to the parties' arguments, the court remarked:

"This court was present during parts of the negotiations. . . . [¶] . . . [¶] I do recall that the offer was discussed or the possibility of the offer and settlement was discussed in depth between the attorneys and the court, and I can't remember if it was on the 12th, but based on the record, it appears as though it took place on the 12th and that Mr. Bartlett had made it clear to the court that he needed a significant amount of time to discuss this with his client and that the next day, what happened . . . is that Mr. Bartlett and his client and the People came in, and there was an agreed-upon plea . . . . [¶] . . . [¶]

"[The prosecutor] had indicated that the prosecuting agency is the agency that makes the determination. Certainly, it's subject to motions and it has to be legal, but is the charging agency. The court's not the charging agency. The defense is not the charging agency. It is the prosecuting office that is the charging agency.

"To negotiate – [the prosecutor] has indicated that she and Mr. Bartlett had a conversation about her having some conversations with her supervisor as to whether or not she could make an offer that was being requested by Mr. Bartlett on your behalf for a – I will refer to it as a less serious charge. It doesn't carry as many consequences; that [the prosecutor] had indicated that she had communicated with a supervisor and that she was not authorized to make such an offer and that she was prepared to go to trial, and I do recall during my conversations with the two attorneys that [the prosecutor] was very clear that she was prepared to go to trial.

"So is it a difficult situation to be in the situation that you were in that day when you had to make these decisions? Yes, it is, but does the court find at this point in time – I'm gonna indicate to you that I have not heard anything that suggests that there was coercion. [¶] . . . [¶]

15.

". . . Based on what I have heard from [the prosecutor], based on my memory, based on listening to Mr. Bartlett over and over again advocating on your behalf in an effort to get a less serious or – well, less serious would be the correct term, charge, that's not an area that I'm going to go into.

"What is relevant right now is whether or not it appears as though you were suffering from coercion, and I'm not hearing anything that suggests that.  [¶] . . . [¶]

". . . Part of what happens – I mean, this is a negotiation, and I'm not the person negotiating.  I'm the person watching or listening to this, and parts of these negotiations take place out of my presence so I can't tell you exactly what was communicated between [the prosecutor] and Mr. Bartlett, but what I can tell you is that [the prosecutor] had communicated from what I heard a reluctance to not go to trial.  She had communicated a reluctance to make any offer consistent with the offer that was being requested on your behalf by Mr. Bartlett and that she wanted – the prosecution, she wanted you, the defendant, that day to decide whether or not he was gonna take that offer because we were due to go to trial within a couple of days, and she has the right to say I'm not gonna leave an offer open.  I'm not gonna make the offer tomorrow.  That – that is within the prosecutor's discretion, and there wasn't anything that I observed that was untoward about what was happening.  [¶] . . . [¶]

". . . [The prosecutor] was communicating that if you were not willing to plead what she was offering to you that she was going to trial and . . . that there was an indicated sentence or that you were looking at the possibility of eight years based on how they were going to proceed.  That's the reality of what you were facing that day.  [¶] . . . [¶]

". . . What happened on those – the two days, and I can't remember the dates, if it was the 12th or the 13th, but what I do recall is the two separate days where Mr. Bartlett kept asking or pestering or pushing [the prosecutor] to make an offer, and she had indicated that she was willing to make one offer but not the offers that Mr. Bartlett was requesting."

The court denied defendant's motion.

On April 11, 2019, pursuant to defendant's request, the trial court reappointed the public defender as his counsel.

b. *Analysis*

Defendant argues on appeal:

16.

"There is good cause to withdraw appellant's plea of no contest because: (1) trial counsel was ineffective in recommending that appellant admit a charge because consent was a defense; (2) trial counsel was ineffective in recommending that appellant admit a charge because he was not a 'caretaker,' which was also a defense; and, (3) the plea was the result of coercion, duress, mistake or ignorance, overcoming his free judgment. The trial court therefore abused its discretion by denying the motion to withdraw the plea."

### i. Ineffective assistance of counsel

" 'Whatever might be the situation in an ideal world,' plea bargaining is an integral component of the criminal justice system and essential to the expeditious and fair administration of our courts. [Citations.]" (*In re Alvernaz* (1992) 2 Cal.4th 924, 933.) Plea bargaining "is a critical stage in the criminal process at which a defendant is entitled to the effective assistance of counsel guaranteed by the federal and California Constitutions." (*Ibid.*) Criminal defendants who "are faced with the crucial decision whether to plead guilty pursuant to a plea bargain or instead proceed to trial" (*ibid.*) "can be expected to rely on counsel's independent evaluation of the charges, applicable law, and evidence, and of the risks and probable outcome of trial" (*ibid.*). "It is well settled that where ineffective assistance of counsel results in the defendant's decision to plead guilty, the defendant has suffered a constitutional violation giving rise to a claim for relief from the guilty plea." (*Id.* at p. 934.)

"In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance." (*People v. Mickel* (2016) 2 Cal.5th 181, 198, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.) "To demonstrate deficient performance, defendant bears the burden of showing that counsel's performance ' " ' "fell below an objective standard of reasonableness . . . under prevailing professional norms." ' " ' [Citation.] To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. [Citations.]"

(*Mickel*, *supra*, at p. 198; see *In re Alvernaz*, *supra*, 2 Cal.4th at p. 934 ["[A] defendant must establish not only incompetent performance by counsel, but also a reasonable probability that, but for counsel's incompetence, the defendant would not have pleaded guilty and would have insisted on proceeding to trial."].)  In addition, "we begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.'  [Citation.]" (*Mickel*, *supra*, at p. 198.)

Here, defendant pled nolo contendere to lewd conduct by a caretaker upon a dependent person.  Section 288, subdivision (c)(2) provides:

> "A person who is a caretaker and commits an act described in subdivision (a) upon a dependent person,[5] with the intent described in subdivision (a), is guilty of a public offense and shall be punished by imprisonment in the state prison for one, two, or three years, or by imprisonment in a county jail for not more than one year."

In turn, subdivision (a) of section 288 reads in pertinent part:

> "[A] person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony . . . ."

Defendant claims that Bartlett rendered ineffective assistance by failing to inform him that there were two defenses to a violation of section 288, subdivision (c)(2):  (1) the victim's consent; and (2) the lack of "caretaker" status.  "While, if counsel had had a substantially conclusive defense it would have been a deprivation of counsel to urge the guilty plea, that is not this case."  (*In re Hawley* (1967) 67 Cal.2d 824, 829.)

---

**5**    " 'Dependent person' means a person, regardless of whether the person lives independently, who has a physical or mental impairment that substantially restricts his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, persons who have physical or developmental disabilities or whose physical or mental abilities have significantly diminished because of age."  (§ 288, subd. (f)(3).)

First, a reasonable attorney could have concluded that consent was not a viable defense. "Ordinarily, consent of the victim is not a defense unless lack of consent is an element of the offense." (*People v. Oliver* (2020) 54 Cal.App.5th 1084, 1094.) "Many sex crimes expressly include the element that the act was accomplished against the victim's will." (*Ibid.*; see, e.g., § 243.4, subd. (a) ["Any person who touches an intimate part of another person while that person is unlawfully restrained by the accused or an accomplice, and if the touching is against the will of the person touched and is for the purpose of sexual arousal, sexual gratification, or sexual abuse, is guilty of sexual battery."]; § 289, subd. (a)(1)(A) ["Any person who commits an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years."].) By contrast, nothing in the language of section 288, subdivisions (a) and (c)(2) indicates that lack of consent is an element of lewd conduct by a caretaker upon a dependent person. (See *People v. Soto* (2011) 51 Cal.4th 229, 233 ["[T]here is no requirement that the lewd acts [proscribed by section 288, subdivisions (a) and (b)(1)] be committed 'against the will of the victim.' "].) "When looking to the words of the statute, a court gives the language its usual, ordinary meaning." (*People v. Snook* (1997) 16 Cal.4th 1210, 1215.) "If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs." (*Ibid.*) Furthermore, " ' " '[i]t is a well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded.' " [Citation.]' " (*People v. Bland* (2002) 28 Cal.4th 313, 337; see *People v. Trevino* (2001) 26 Cal.4th 237, 242 ["When the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the normal inference is that the Legislature intended a difference in meaning."].)

Defendant points out that CALCRIM No. 1060 (Lewd or Lascivious Act: Dependent Person) "does not include any statement that consent is not a defense" and even directs a trial court to " 'instruct on the defense' " if it " 'concludes that consent is a defense and there is sufficient evidence.' "[6]  However, as defendant acknowledges, jury instructions "are not themselves the law," "are not authority to establish legal propositions or precedent," and "should not be cited as authority for legal principles in appellate opinions."  (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.)  "At most, *when they are accurate*, . . . they restate the law."  (*Ibid.*, italics added.)

Even assuming, arguendo, that consent could have been asserted as a defense, the evidence was far from substantially conclusive on the issue.  During an interrogation with Kelly, defendant stated that T.M. consented to a "massage" "down there."  At the very least, it is debatable that his lewd act, i.e., "plac[ing] one finger inside [T.M.'s] vagina

---

[6]    CALCRIM No. 1060 reads in part:

"To prove that the defendant is guilty of this crime, the People must prove that:

"1.  The defendant was a caretaker of a dependent person;

"2.  The defendant, while serving as a caretaker, willfully (committed/conspired to commit/aided and abetted/facilitated) a lewd or lascivious act on that person;

"[AND]

"3.  The defendant (committed/conspired to commit/aided and abetted/facilitated) the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of (himself/herself) or the dependent person(;/.)"

The following paragraph is found under the heading "**BENCH NOTES**" and subheading "*Defenses—Instructional Duty*":

"In the context of lewd acts accomplished by force on a minor, there is disagreement as to whether knowing consent by the minor is an affirmative defense.  [Citations.]  If the court concludes that consent is a defense and there is sufficient evidence, the court has a **sua sponte** duty to instruct on the defense."

20.

and mov[ing] it in and out," could be characterized as a massage. At the preliminary hearing, T.M. testified that defendant "violated" her and that she was scared of him. On cross-examination, she apparently agreed with Bartlett that she "consented to it," "didn't tell [defendant] no," "didn't tell him to stop," and "understood everything that was happening." (Boldface omitted.) On redirect examination, T.M.—who seemed to be confused as well as despondent—indicated both that she permitted and "didn't want" defendant to insert his finger into her vagina. She later explained that she could not tell him to stop because she was "shocked." The record contains an opinion from Thiagarajan, T.M.'s longtime neurologist, that T.M. "suffers from memory loss"; has "impaired" cognitive abilities; "is totally dependent on others"; and "is no longer able to make any legal decisions for herself" due to her advanced multiple sclerosis. "Under such circumstances the paramount consideration of the lawyer is to determine whether it is reasonably possible that he could convince a jury of his version of the facts." (*In re Hawley*, *supra*, 67 Cal.2d at p. 829.) A reasonable attorney could have concluded that the jury would not have believed T.M. consented to the lewd act or had the capacity to do so.

Next, a reasonable attorney could have concluded that defendant was a caretaker for the purposes of section 288. " 'Caretaker' means an owner, operator, administrator, employee, independent contractor, agent, or volunteer of any of the following public or private facilities when the facilities provide care for elder or dependent persons: [¶] . . . [¶] . . . Home health agencies." (§ 288, subd. (f)(1)(C).) Defendant claims that he "was not a 'caretaker' " "at the time of the alleged offense" since he "was no longer performing physical therapy through a facility that was providing care for a dependent person." Citing *People v. Chenelle* (2016) 4 Cal.App.5th 1255, 1263, defendant details:

> "The elements of lewd conduct with a dependent adult by a caretaker are: (1) the defendant was a caretaker of a dependent person, (2) the defendant, *while serving as a caretaker*, willfully committed a lewd or lascivious act on *that* person, and (3) the defendant committed the act with

21.

the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the dependent person." (Italics added.)

This language, which is lifted from CALCRIM No. 1060 (see *ante*, fn. 6; see also *People v. Chenelle, supra*, 4 Cal.App.5th at p. 1263), seems to convey that the proscribed conduct must have been perpetrated (1) by the victim's caretaker; and (2) while the caretaker was serving in that capacity.

The record indicates that—at the time of the incident—defendant was working as a licensed physical therapist for Agency A and Agency B, two different home health agencies that provide such care. The record also shows that defendant wore "medical scrubs" and his work badge during the March 2016 visit and both T.M. and F.M. believed that the visit had been sanctioned by Agency B.

Regardless, in view of the plain language of section 288, subdivisions (a) and (c)(2) (see *People v. Snook, supra*, 16 Cal.4th at p. 1215), culpability does not hinge on whether the offender committed the lewd act while he was the victim's caretaker. Instead, the statute simply requires that the perpetrator was "*a* caretaker" and the proscribed act was performed "upon *a* dependent person." (§ 288, subd. (c)(2), italics added; see *People v. Guzman* (2005) 35 Cal.4th 577, 587 [" '[I]nsert[ing]' additional language into a statute 'violate[s] the cardinal rule of statutory construction that courts must not add provisions to statutes.' "].) Reliance cannot be placed on the wording of CALCRIM No. 1060. (See *People v. Morales, supra*, 25 Cal.4th at p. 48, fn. 7.)

ii. Coercion*

"On application of the defendant at any time before judgment or within six months after an order granting probation is made if entry of judgment is suspended, the court may, and in case of a defendant who appeared without counsel at the time of the plea the court shall, for a good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted." (§ 1018.) "To establish good cause to withdraw a guilty plea,

---

\*      See footnote, *ante*, page 1.

the defendant must show by clear and convincing evidence that he or she was operating under mistake, ignorance, or any other factor overcoming the exercise of his or her free judgment, including inadvertence, fraud, or duress." (*People v. Breslin* (2012) 205 Cal.App.4th 1409, 1416; see *People v. Dillard* (2017) 8 Cal.App.5th 657, 665 (*Dillard*) ["A plea may not be withdrawn simply because a defendant has changed his or her mind."].) "The defendant must also show prejudice in that he or she would not have accepted the plea bargain had it not been for the mistake." (*People v. Breslin*, *supra*, at p. 1416.) "In ruling on a motion to withdraw a plea, the trial court may take into account the defendant's credibility and his or her interest in the outcome of the proceedings." (*Dillard*, *supra*, 8 Cal.App.5th at p. 665.)

"A decision to deny a motion to withdraw a guilty plea ' "rests in the sound discretion of the trial court" ' and is final unless the defendant can show a clear abuse of that discretion. [Citation.]" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1254.) "An abuse of discretion is found if the court exercises discretion in an arbitrary, capricious or patently absurd manner resulting in a manifest miscarriage of justice." (*People v. Shaw* (1998) 64 Cal.App.4th 492, 496.) "We will defer to a trial court's credibility determinations that are supported by substantial evidence." (*Dillard*, *supra*, 8 Cal.App.5th at p. 665; see *People v. Fairbank*, *supra*, at p. 1254 ["trial court's own observations" may constitute substantial evidence].)

We conclude the trial court did not abuse its discretion when it denied defendant's withdrawal motion. As previously discussed, the purported defenses of consent and non-caretaker status were not substantially conclusive. (See *ante*, at pp. 18-22.) Regarding defendant's claim of coercion, the record demonstrates that the prosecution made its offer on July 12, 2018. Defendant was then given an opportunity to consult with Bartlett before finalizing his decision the following day. The court, who was present during part of the negotiations between the attorneys, recalled that Bartlett "kept asking or pestering or pushing" the prosecutor to make another offer, but the prosecutor—who conferred

with her supervisor via text message—"indicated that she was willing to make [the original] offer but not the offers that Mr. Bartlett was requesting." The prosecutor, who "was very clear that she was prepared to go to trial" beginning July 16, 2018, wanted defendant "that day [July 13, 2018] to decide whether or not he was gonna take that offer." "[T]here is no constitutional right to a plea bargain" (*People v. Trejo* (2011) 199 Cal.App.4th 646, 655) and a prosecutor is "not obligated to make an offer" (*ibid.*). "Moreover, plea bargaining is governed by principles of contract law" (*ibid.*), meaning "a prosecutor may withdraw from a plea bargain, or revoke or withdraw the offer, before the defendant pleads guilty or otherwise detrimentally relies on the bargain" (*id.* at p. 656). Although defendant asserts that he "felt threatened by the possibility of an eight-year prison term, and unreasonably pressured by the sudden need to accept the offer before it was withdrawn," he was not "under any more or less pressure than every other defendant faced with serious felony charges and the offer of a plea bargain." (*People v. Huricks* (1995) 32 Cal.App.4th 1201, 1208.)

Defendant argues that Bartlett "used scare tactics to coerce the plea, telling [him] that he would literally wear a jacket bearing the numbers '288' in prison, marking him as a sex offender, and subjecting him to attack, rape and even murder if he were sent to prison." (Cf. *People v. Toth* (1964) 224 Cal.App.2d 130, 132 [a defendant accused of murder claimed that defense counsel used " 'threats, duress, and intimidation' " to induce his guilty plea by telling him and his daughters that he would " 'get the gas chamber' " if the case were tried].) However, he does not allege that "any prosecutor or other officer of the state participated in any way in these representations to him." (*Ibid.*) " '[T]he advice, persuasion, or expression of opinion of [a defendant's] attorney will not suffice to vitiate his plea, in the absence of some showing of corroboration by a responsible state officer [citations].' [Citations.]" (*People v. Nocelotl* (2012) 211 Cal.App.4th 1091, 1096-1097; accord, *People v. Gilbert* (1944) 25 Cal.2d 422, 443; *People v. Toth*, *supra*, at p. 132.)

## II. Assembly Bill No. 1950[*]

At the time defendant was sentenced, section 1203.1, former subdivision (a), provided in part:

> "The court, or judge thereof, in the order granting probation, may suspend the imposing or the execution of the sentence and may direct that the suspension may continue for a period of time not exceeding the maximum possible term of the sentence, . . . and upon those terms and conditions as it shall determine. The court, or judge thereof, in the order granting probation and as a condition thereof, may imprison the defendant in a county jail for a period not exceeding the maximum time fixed by law in the case. [¶] However, where the maximum possible term of the sentence is five years or less, then the period of suspension of imposition or execution of sentence may, in the discretion of the court, continue for not over five years."

After defendant was sentenced, but while his case was still pending on appeal, the Legislature enacted Assembly Bill No. 1950 (Stats. 2020, ch. 328, § 2). As of January 1, 2021, section 1203.1, subdivision (a), provides in part:

> "The court, or judge thereof, in the order granting probation, may suspend the imposing or the execution of the sentence and may direct that the suspension may continue for a period of time not exceeding two years, and upon those terms and conditions as it shall determine. The court, or judge thereof, in the order granting probation and as a condition thereof, may imprison the defendant in a county jail for a period not exceeding the maximum time fixed by law in the case."

Defendant asserts that Assembly Bill No. 1950 applies retroactively to the case and requests a remand "for the purpose of modifying [his] term of probation to two years." The Attorney General agrees that defendant is entitled to the benefit of Assembly Bill No. 1950 but maintains that—on remand—"the People should be afforded the opportunity to withdraw from the plea and return to the status quo ante." We agree with the Attorney General.

---

[*] See footnote, *ante*, page 1.

In *People v. Stamps* (2020) 9 Cal.5th 685 (*Stamps*), our Supreme Court concluded that a defendant was entitled to the benefit of an ameliorative change in the law; specifically, pursuant to Senate Bill No. 1393 (2017-2018 Reg. Sess.) (Senate Bill No. 1393) (Stats. 2018, ch. 1013, §§ 1, 2), he was entitled to have the matter remanded for the trial court to exercise its discretion to strike a serious felony conviction enhancement in the interest of judgment. (*Stamps*, *supra*, at p. 699.) However, because the serious felony conviction enhancement was imposed as part of a negotiated stipulated sentence, if the trial court exercised its discretion to strike the enhancement, the People and the trial court were permitted to withdraw approval for the plea agreement. (*Id.* at pp. 707-708.) The defendant was not permitted " ' "to whittle down the sentence 'but otherwise leave the plea bargain intact.' " ' " (*Id.* at p. 706.)

Our court reached the same conclusion in *People v. Hernandez* (2020) 55 Cal.App.5th 942, review granted Jan. 27, 2021, S265739, where we directed the trial court to strike prior prison term enhancements pursuant to Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill No. 136) (Stats. 2019, ch. 590, § 1) but also concluded that the People and trial court must be permitted to withdraw approval for the negotiated plea. (*Hernandez*, *supra*, at pp. 958-959.) We explained that the distinction between the discretionary nature of Senate Bill No. 1393 (*permitting* trial courts to strike serious felony enhancements) and the mandatory nature of Senate Bill No. 136 (*prohibiting* imposition of prior prison term enhancements for convictions not served for sexually violent offenses) was not dispositive to the issue of whether the People or a trial court must be permitted to withdraw from a plea agreement. (*Hernandez*, at p. 957.) Instead, as we explained, we review "the history of the amendment[] to determine whether there was any intent . . . 'to change well-settled law that a court lacks discretion to modify a plea agreement unless the parties agree to the modification' to determine whether the district attorney can withdraw from the plea agreement." (*Ibid.*; see *Stamps*, *supra*, 9 Cal.5th at p. 701 ["In order to justify a remand for the court to consider striking his

26.

serious felony enhancement while maintaining the remainder of his bargain, defendant must establish not only that Senate Bill [No.] 1393 applies retroactively, but that, in enacting that provision, the Legislature intended to overturn long-standing law that a court cannot unilaterally modify an agreed-upon term by striking portions of it under section 1385."].)  We concluded that "there is no evidence the Legislature intended Senate Bill [No.] 136 to permit the trial court to unilaterally modify a plea agreement once the prior prison term enhancements are stricken."  (*Hernandez*, *supra*, at p. 958.)

Like Senate Bills Nos. 136 and 1393, there is no evidence that the Legislature intended Assembly Bill No. 1950 to permit unilateral modification of plea agreements by shortening negotiated terms of probation.[7]  We therefore vacate the sentence and remand the matter to the trial court to impose a term of probation that conforms with Assembly Bill No. 1950 and to permit the People and the trial court an opportunity to accede to the shorter term of probation or withdraw from the plea agreement.[8]

## III.   *Dueñas*[*]

Citing *Dueñas*, *supra*, 30 Cal.App.5th 1157, defendant contends that the $40 court operations assessment and the $30 court facilities assessment "must be vacated or stayed"

---

**7**     To be clear, we recognize that the Assembly and Senate Committees on Public Safety both explain that proponents of Assembly Bill No. 1950 assert in broad terms that shortening terms of probation is beneficial for society and probationers.  For instance, the Senate Committee on Public Safety summarized a proponent's view that "probation supervision is most beneficial in the early part of a probation term" and shorter terms of probation "would enable probation officers to more effectively manage their caseloads." (Sen. Com. on Public Safety, Rep. on Assem. Bill No. 1950 (2019-2020 Reg. Sess.), as amended June 10, 2020, p. 5.)  While those positions certainly support reduced terms of probation, they do not speak to whether Assembly Bill No. 1950 was intended to modify negotiated plea agreements.

**8**     It should be noted that, in *Hernandez*, the California Supreme Court limited review to two issues, one of which is:  "If the plea agreement is rescinded in light of Senate Bill No. 136, can the defendant be sentenced to a term longer than provided for in the original agreement?"

*     See footnote, *ante*, page 1.

27.

because "[t]he prosecution failed to present evidence that [he] had the ability to pay the assessments, and the trial court made an explicit finding that he did not have the ability to pay restitution fines." Although *Dueñas* was filed almost four months before his sentencing hearing, defendant himself acknowledges that he did not object to the assessments below. Nonetheless, we see no reason to foreclose any objection defendant may make based on inability to pay when the matter is remanded for modification of the length of defendant's probation term. Accordingly, upon remand, the trial court may consider defendant's arguments based on inability to pay. (Cf. *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["[W]hen part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' "].)

## DISPOSITION

The sentence is vacated. The matter is remanded to the trial court to modify the term of probation to conform with Assembly Bill No. 1950 and permit the People and trial court an opportunity to withdraw from the plea agreement.


DETJEN, J.

WE CONCUR:


HILL, P. J.


PEÑA, J.


28.